Strafford,
Nov. 2, 1937.

N. E. REDLON COMPANY

*v.*

FRANKLIN SQUARE CORPORATION.

138

*Conrad E. Snow* and *Frank E. Blackburn* (*Mr. Snow* orally), for the plaintiff.

*Hughes & Burns* (*Mr. Hughes* orally), for the defendant.

PAGE, J. I. The defendant urges that under the contract arbitration of disputed questions was a condition precedent to legal action. Article 40 of the Standard Documents provides that "All questions subject to arbitration under this Contract shall be submitted to arbitration at the choice of either party to the dispute . . . . The demand for arbitration shall be filed in writing with the Architect." The referee ruled that the contract did not require arbitration unless called for by one of the parties. This was a correct interpretation of the contract.

The plaintiff first suggested arbitration and on January 20, 1931, it was agreed that the plaintiff should name its arbitrator immediately and that the defendant should name one on January 23. The plaintiff formally demanded arbitration and named an arbitrator on

January 21. The defendant never named one, either on January 23 or any later day. With the apparent purpose of securing its mechanic's lien, the plaintiff brought this action on January 23.

Three days later, the defendant's treasurer learned of the beginning of suit and announced that no choice of an arbitrator would be made. For nearly a year thereafter the plaintiff made various attempts to get the disputes referred to arbitrators, but the defendant did not yield. At the February, 1932, term, the plaintiff filed a bill praying for an order of arbitration and the stay of trial in the present action. The defendant filed an answer to this bill, alleging that the plaintiff had an adequate remedy at law, that it had elected to proceed at law rather than by arbitration and was not entitled to equitable relief, and that the rights of the parties should be determined in the action at law. It does not appear that the bill in equity was ever heard.

The parties went to trial upon the merits in the action at law. Each submitted its case fully upon the facts. During the trial, the defendant raised the question of jurisdiction, but not as a preliminary one. The referee correctly ruled that both parties were estopped to deny the jurisdiction of the court in this action. The plaintiff desired the court to determine its claim in the pending action. That was a complete waiver of its attempts to get arbitration. The defendant, by resisting the plaintiff's attempts and its insistence that the plaintiff had no right to arbitration and must pursue its remedy in this action, has also waived any claim to arbitration. Even if the defendant had had a good case for arbitration prior to trial, its claim should have been presented and determined as a preliminary question. The submission to a trial upon the merits without it effectively barred the defendant from a later raising of the question. *Sauriolle* v. *O'Gorman*, 86 N. H. 39, 49; *American Motorists &c. Company* v. *Garage*, 86 N. H. 362, 364; *Gibbs* v. *Casualty Co.*, 87 N. H. 19, 21; *Howe* v. *Howe*, 87 N. H. 338, 339.

II. A specification in the contract provided as follows: "*Floor timbers.* Supply and erect long leaf hard pine floor timbers of sizes shown and spaced on centers as indicated in the framing plans."

The referee found that on August 21, 1929, ten days before the contract was signed, the plaintiff obtained a quotation upon such timber at an average price of $66.50 per thousand delivered at the building. After the work began in September, it was discovered that the hard pine market was sold out, that the price then quoted was $96, and that it would take five or six weeks to get deliveries.

The plaintiff asked the architect for permission to substitute Douglas fir in order to avoid delay. The architect explained the situation to Mr. Rosen who acted for the defendant, Mr. Rosen consented to the use of fir and it was substituted. For practical purposes the fir was found by the referee to be as efficient as hard pine for the purpose for which it was used. The matter of an allowance was not discussed, and none was claimed. The fir cost about $38 a thousand. While the testimony upon most points was contradictory, the record discloses evidence to support all these findings.

To sustain its claim that it is entitled to be allowed what the plaintiff may have saved by the substitution, the defendant urges that valid consent to the change was not obtained because the plaintiff failed to disclose the fact that the Douglas fir cost much less than hard pine. The applicable provision of the Standard Documents is that the owner, "without invalidating the Contract, may order extra work or make changes by altering, adding to or deducting from the work, the Contract Sum being adjusted accordingly." The specifications went further and gave the architect the right to make such alterations, additions or omissions in the work or materials as he or the owner thought advisable. "The amount to be added or deducted for such change is to be fixed by a schedule of prices previously submitted and agreed upon and to be added or deducted from the final payment as the case may demand."

The intention was that if the parties by mutual consent amended the contract so that the work was enlarged or diminished, the basis of any price-change was at the same time to be agreed upon. The validity of amendments, even by parol, is pretty generally conceded, but here the parties agreed that such amendments, if made, should be understood as complete and that nothing further was to be implied.

If no price-change was agreed upon, there could be no implication of one. If a possible price-change were involved, the party to be benefited by an adjustment was required to make his claim when he gave consent to the change. This the defendant did not do. The amendment was an agreement for change in the work but not for change in price.

Consistently with this view it has been said of a similar, though less explicit, provision that "it was a condition precedent to either party being entitled to add the value [of the changes] to or deduct it from the contract price that the value of the changes be agreed upon in writing." *Budd &c. Company* v. *Company*, 272 Fed. 775, 777. That case really turned, however, on the fact that the engineer

gave consent to the change and the owner did not. The change was an extra and the owner knew nothing about it until the work was finished and payment demanded. But the court seems correctly to have interpreted the contract when it declared that the stipulations "are both equitable and reasonable, and are intended to protect the owner against doubtful claims, and to protect the contractor from doubtful deductions." The party claiming the protection of the condition, in this case the plaintiff, may of course waive the performance of the condition expressly or by conduct (see a very full note, 66 A. L. R. 649, 662-684), but there is no possibility of concluding from the findings (or from the evidence in the record) that the plaintiff has waived.

A *dictum* in the *Budd* case to the effect that the plaintiff's knowledge concerning relative costs must be communicated to the defendant is inapplicable to the circumstances we are considering. In the present case consent was actually given; in the *Budd* case the silence of the plaintiff as to the fact of change made it impossible for the defendant to consent. As the change there made called for extra charges, the contractor had to be the moving party and notify the owner that extra pay would be asked. In this case the owner must make the claim. The Redlon Company's silence does not appear to have been in fact fraudulent, nor does it appear to have induced the defendant's consent to the change. Just as the silence of the plaintiff as to comparative costs does not appear to have induced the consent (compare *Newmarket &c. Foundry* v. *Harvey*, 23 N. H. 395, 410, and cases cited), so also its non-fraudulent silence does not require a finding that the plaintiff intended to waive the condition that any change in price should be contemporaneously claimed by the defendant and adjusted, or that the plaintiff's silence even misled the defendant. (*Kilgore* v. *Association*, 78 N. H. 498, 501).

As far as appears, Rosen would have consented to the substitution of the fir even if he had known that it cost less. Such knowledge could have given him no advantage except the sure apprehension that a claim for allowance was in order. Presumably he knew that under the contract he was entitled to an adjustment if the cost were less to the contractor. He had full opportunity to inquire. He did not inquire. If this was mere thoughtlessness (and not a waiver) on his part, it may equally have been thoughtlessness on the part of the architect not to mention the matter, or mere thoughtlessness on the part of the plaintiff not to conceive that the architect (who knew the facts) would be thoughtless. To give the defendant the benefit of

the plaintiff's oversight, while removing from the defendant the burden of the thoughtlessness of its treasurer and architect would be to misapply the "equitable and reasonable" provisions of the contract. There being no findings or conclusive evidence that the defendant failed to claim an adjustment because of reliance upon the silence of the plaintiff, rather than because of some other motive, and there being no finding or such evidence that the plaintiff's silence was in fact fraudulent, the barring of the plaintiff's full contractual claim for timbering is not a required conclusion.

III. One item of the specification read thus: "*Waterproofing*. All exterior foundation walls to be within 6" of the grade are to be water proofed on the outside after the forms are removed by applying two coats of an approved manufacture of membrane waterproofing which is to be applied strictly in accordance with the directions of the manufacturer. After this is approved, backfilling may be done."

The "Standard Documents" provides: "Materials or work described in words which so applied have a well-known technical or trade meaning shall be held to refer to such recognized standards."

The evidence showed conclusively that the term "membrane waterproofing" had a well-known trade meaning and denoted fabric or felt, alternating with asphalt or pitch. While asserting that he did not know of this definition when the contract was made, the architect in effect conceded that he was enlightened as to the correct meaning by the defendant's evidence. What the plaintiff did apply, with the architect's knowledge and approval, was a coat of asphalt laid on from a spray-gun. This process is known in the trade as damp-proofing.

The referee found that "damp-proofing" was what the architect meant by the term "membrane waterproofing" when he specified the latter, and that the work done was identical with what the contract called for. He denied the defendant any allowance for breach of the contract. This is equivalent to a ruling that the contract meant what the architect understood it to mean when he wrote it.

No finding was made as to the understanding of the parties. While their understanding was immaterial, certain evidence of what they knew points to the need of a standard for construction differing from that adopted. The plaintiff knew that the sub-contractor who did the work bid upon it and billed it as damp-proofing. Both parties may be presumed to have known that similar work applied to exposed walls above the roof was both specified and executed as damp-proofing. Some canon of construction other than the architect's was obviously required under such circumstances.

The plaintiff argues that the architect's interpretation was binding, since the contract makes the architect, in the first instance, "the interpreter of the conditions of the Contract and the judge of its performance." But the contract forbids him to side with either party and requires him to "use his powers under the contract to enforce its faithful performance by both." Arbitrary interpretation is not permitted, nor can the architect adopt as the canon of construction what he understood by "membrane waterproofing" when he drew the contract. The meaning of the words, not that of the scrivener, is to be ascertained.

The contract provides its own standard—the well-known trade meaning. Neither party could be heard to say that he had in mind something else. Even less could the scrivener be allowed to say that he had a definition peculiar to himself. What the trade meaning is he now admits in substance, yet the plaintiff insists that the architect's understanding in 1929 must be substituted for the canon expressed in the contract.

Where, upon the application of the suitable canon of construction, a certain interpretation is required, parol evidence is not admissible that the parties understood something else. *Goodeno* v. *Hutchinson*, 54 N. H. 159; *Proctor* v. *Gilson*, 49 N. H. 62; *Goodwin* v. *Goodwin*, 59 N. H. 548; *Sleeper* v. *Laconia*, 60 N. H. 201; *Meredith &c. Ass'n* v. *Company*, 66 N. H. 267. The exclusion follows upon the rule of construction. "The point to be determined is, not what they in fact intended or expected to do, but what they in fact expressed as their purpose in the writing presented for interpretation." *Marsh* v. *Insurance Co.*, 71 N. H. 253, 254. See also *Metropolitan Life &c. Co.* v. *Olsen*, 81 N. H. 143, 146; *Kendall* v. *Green*, 67 N. H. 557, 562; *Trepanier* v. *Insurance Co.*, 88 N. H. 118. Still less in point is what the architect in fact intended or expected. The contract did not expressly make the test what the writer of the specifications intended, as in *Osgood &c. Company* v. *Claremont*, 81 N. H. 29, but did expressly provide for a test quite different, so that the conceptions and misconceptions of the architect were wholly immaterial.

Since the contract, properly interpreted, required the use of "membrane waterproofing" consisting of alternate layers of asphalt or pitch and a fabric or felt, the case must go back for findings as to what allowance, if any, is required because of the substitution of dampproofing without the defendant's consent.

IV. The contract stipulated that before any cement floors were laid in the basement or next to the ground, "the surface is to be level

with gravel so that there will be at least a six inch bed under all floors." This is to be interpreted as requiring a gravel-bed everywhere at least six inches in depth. There was a dispute as to whether this specification was complied with. The referee first found that the plaintiff was not in default in this regard. After rehearing, there were some important modifications of the findings. Taken altogether, the findings may be summarized thus:

The purpose of the gravel was to take care of water under the floor. To some extent the architect authorized the use of stone chips resulting from the removal of ledge in the basement. This served the interests of both parties, gave the defendant better drainage, and saved the plaintiff the expense of hauling away the chips.

Twenty-nine test-holes made in the floor to hard-pan by one of the defendant's witnesses disclosed the following facts. In the Franklin Clothes store the concrete at the points where holes were made averaged 5 1/8 inches in thickness, the fill, 2 3/8 inches. The corresponding figures in other portions of the building were: Grant store, 5 and 3 5/7 inches; Montgomery Ward store, 5 and 2 1/4 to 2 1/2 inches; the A. and P. store, 5 1/16 and 2 1/3 inches; the shoe store, 5 1/4 and 3.87 inches. The floor thickness in excess of four inches (except in the Montgomery Ward section) was due to the concrete penetrating the fill and absorbing a part of it. Nevertheless the fill at these test-points in almost every case fell short of six inches. The depth varied. Such as it is, the fill serves its purpose for drainage. These findings are sustainable, though the evidence is conflicting at some points.

Two questions appear in connection with the fill. First, the referee ruled that the architect acted within his authority in permitting the substitution of ledge chips for part of the gravel without consent of the defendant. The quantity of chips thus used has not been determined, but there is no evidence that it was more than a small proportion. To the extent that they were used the referee has found upon evidence in the record that they furnished better drainage. It is clear that the change was a minor one. The contract gave the architect "authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building." The ruling of the referee was correct.

Second, the referee has found that the gravel-fill in the test-holes fell short of six inches in almost every case. There is no question that at many points there is a deficiency in the fill. A specification of six inches everywhere is not complied with when most of twenty-nine tests made show such a deficiency. As the fill serves its purpose,

the defendant is denied any adjustment. But the sustainable finding that the defendant has suffered no special damage from the deficiency is not decisive upon the right of the defendant to claim an adjustment for a change to which it does not appear that he gave his consent.

The plaintiff knew the fact of change, whatever its extent. If the plaintiff scanted the work without notifying the defendant (and this is a possible inference from the findings), the case stands as the converse of that of *Budd &c. Company* v. *Company, supra,* where the claiming of an allowance by the defendant at the time change was made was not a condition precedent to an adjustment of the contract-price.

But in the present state of the findings the legal situation is far from clear. Moreover, if a deduction is to be made, the findings are insufficient to form a basis of computation. There is no finding of the extent of the deficiency, taking the area as a whole. The referee did find that the amount of the deficiency could be ascertained only by taking up the whole floor; consequently, it seems, he made no finding of the content of the deficiency.

If the referee's conception were that a deficiency must be measured with complete accuracy, he fell into error. Findings may be made upon the balance of probabilities as disclosed by all of the evidence. If the referee felt that the results of the examination through twenty-nine holes was of no aid in determining the average of deficiency throughout the whole area, he has not found that as a fact.

The issue should be reconsidered, if necessary heard again, and distinct findings should be made as to whether the defendant knew of and consented to the deficiency and, if it did not, what would have been the cost to the plaintiff of preparing for, furnishing and spreading any deficiency of gravel shown to be more probable than otherwise. But no deductions should be made from the contract-price because (1) the fill does not properly drain the building, the contrary having been properly found, or (2) because of any assumed deficiency in ledge excavation, which is understood not to be in issue. Any ledge excavation not made as required by the contract and not already paid for is in any event to be at the cost of the defendant.

V. The specifications provided for a four-inch concrete floor over the entire basement area, finished with a layer of granolithic one inch thick. It was conceded that the specification was complied with in the main section of the building and that it was not in the two wings, where the concrete was laid only four inches in thickness. It is also conceded that the plans for the wings called for only the four-inch

floor. One clause of the contract read: "The work described in these specifications and not shown on the plans or vice versa, is to be done as a part of the contract and in case of a difference the architect shall decide which is to be followed." The architect instructed the plaintiff to lay the basement floors in the wings in single four-inch slabs with integral waterproofing.

The referee did not find that the architect made a construction of the contract under the rule quoted. He did find: "This change was made by the architect. The architect testified that the change was made because of water conditions and because he thought that a 4" floor with integral waterproofing mixed in the entire body of the concrete would have more resistance to water than the floor provided for in the specifications . . . The Referee finds that this change was made by the architect rather than by the plaintiff and in making the change the architect acted within his authority and in what he believed to be the best interest of the defendant, and that Mr. Rosen knew about it before the floors were finished. The architect further testified that the change was consistent with the purpose of the building, that it was what he considered a minor change and it involved no extra cost to the owner . . . . The Referee finds that the defendant is entitled to no credit on account of his claim that the floor was not constructed properly or according to the contract."

In view of these findings, it is apparent that a change was made in the contract. That it was not made by mutual consent of the parties might be inferred from the lack of a finding that Rosen knew of the change at the time it was made. Upon this assumption, the defendant would be entitled to an allowance provided the change was not a minor one.

The contract provides that "the Architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purpose of the building." While the referee reports that the architect testified that the change made was a minor one as thus defined, and apparently intended so to find, the fact was not specifically found. That fact is material to the conclusion reached by the referee. Since we cannot supply the finding (*Nashua &c. Company* v. *Burke*, 84 N. H. 490, 491; *Watson* v. *Walker*, 33 N. H. 131, 141) the doubt may be cleared upon recommittal by further findings.

VI. In view of the opinions already expressed, the defendant's exceptions to the admission of evidence require only short consideration. The architect's opinion as to the efficiency of ledge chips for

drainage and his testimony that he approved their use were properly admitted upon the issues tried under the construction of the contract adopted here.

There was no error in permitting the architect to testify that he authorized four-inch basement floors in the wings. If the contract permitted him to do so, the fact that he did it was a material part of the plaintiff's case. If the contract did not justify his act, the defendant cannot be harmed. It was proper to receive opinions expressed by the architect that the basement floors in the wings with integral waterproofing constituted a minor change as compared with two layers totalling five inches. Evidence in regard to integral waterproofing in the basement floors of the wings was material also as tending to dispute the defendant's contention that water came through the floors.

In view of the testimony and finding that the defendant consented to the change in timber-stock, the admission of testimony by the architect that he approved the change and told the plaintiff to make it leaves the defendant without sustainable complaint. The architect's testimony regarding attempts to have disputes arbitrated and the nature of membrane waterproofing was either admissible or harmless in accordance with the views that we have expressed.

There remains only the exception to the admission of testimony from the Portland Building Code of the comparative stresses of hard pine and fir. Before he testified from the Building Code, the architect had already testified that at the time he got the consent, he showed to Rosen this "Portland Building Code which showed the stress and the strength of the lumber to be equal so that his building was not being weakened in the least. In some manuals it is given, fir is given as a little more than hard pine. From the Portland Building Code and the Steel Manuals it is given the same." When, subject to exception, the architect later testified that "for bending in extreme horizontal the Douglas fir is 15,000 pounds; and of pine, yellow pine, which is the long leaf and the strongest listed is 15,000 pounds," he added nothing of moment to what was already before the referee. It could not prejudice the defendant that the contents of the book exhibited to Rosen were shown to be as asserted in previous testimony received without objection. The exception was general. If the defendant objected to the evidence as bearing on the issue whether in fact fir and pine were equal, that should have been specially urged for a ruling by the referee in accordance with the familiar principle. *Caplan* v. *Caplan*, 83 N. H. 318, 325.

Aside from the errors pointed out, all exceptions are overruled. The case is recommitted for further findings in accordance with this opinion.

*Recommitted.*

All concurred.

————

ON REHEARING. After the foregoing opinion was filed the defendant moved for a rehearing.

*Hughes & Burns,* for the motion.

*Conrad E. Snow* (orally), opposed.

PAGE, J. The defendant urges that the provision in the latter part of Art. 15 of the "Standard Documents" determined the method for arriving at changes of price in case changes were made in the work, and in consequence that the former opinion reached a wrong conclusion in holding that since the defendant consented to the change in the timbers without claiming an adjustment in price, the contract price was not affected. The defendant's attitude is unwarranted in view of another portion of the contract, the specifications, where it is provided that in case of alterations, "The amount to be added or deducted for such change is to be fixed by a schedule of prices previously submitted and agreed upon and to be added or deducted from the final payment as the case may demand."

The article relied upon by the defendant must be read in the light of the provision just quoted from the specifications. Article 15 provides: "The value of any such extra work or change shall be determined in one or more of the following ways: (a) By estimate and acceptance in a lump sum. (b) By unit prices named in the contract or subsequently agreed upon. (c) By cost and percentage or by cost and a fixed fee." The requirement, however, was that the method should be agreed upon in advance. What would be done in case of a timely claim of the right to adjustment, without agreement of how it should be calculated, is a question not here presented.

Article 15 is wholly consistent with the views just stated, for it continues: "If none of the above methods is agreed upon, the Contractor, provided he receives an order as above, shall proceed with the work. In such case . . . he shall keep and present in such form as the Architect may direct, a correct account of the net cost of labor and materials, together with vouchers." The architect ordered the

change, but he did not direct, nor did the defendant demand, the keeping in any form of a cost account which could be the basis of a contemplated later adjustment, and the plaintiff was under no obligation to keep such an account.

Whether the parties, mutually desirous of avoiding delay and mutual losses, were content to change the timbers without changing the contract price, or the defendant from some unknown motive or oversight failed to suggest an allowance or any means for calculating it, no such suggestion in fact was made as required by the contract, and that is the turning-point in this case.

The defendant's claim that the substitution was obtained by the fraudulent representation that it would avoid delay rests upon no finding and no evidence that compels such a finding. Moreover, it is a suggestion never made at any earlier stage of the case, and the issue cannot now be raised.

*Former result affirmed.*

All concurred.