34 N.J. Super. 478 (1954)
112 A.2d 762
TERMINAL CONSTRUCTION CORPORATION, A CORPORATION OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
BERGEN COUNTY HACKENSACK RIVER SANITARY SEWER DISTRICT AUTHORITY, A BODY CORPORATE, NOW KNOWN AS BERGEN COUNTY SEWER AUTHORITY, A CORPORATION, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 15, 1954.
Decided May 12, 1954.
*483 Before Judges EASTWOOD, JAYNE and FRANCIS.
Mr. Aaron Heller argued the cause for plaintiff-respondent and cross-appellant (Messrs. Heller & Laiks, attorneys).
Mr. Walter Jones argued the cause for defendant-appellant and cross-respondent.
The opinion of the court was delivered by FRANCIS, J.A.D.
Prior to August 12, 1949 the appellant Bergen County Sewer Authority decided to have erected a sewage treatment plant and system in Little Ferry, New Jersey. The project was broken down into 18 separate parts and bids for the construction of the individual parts were sought by public advertisement.
One of the parts covered the construction of the sewage treatment plant. This was known as Contract No. 1. Elaborate information with respect to the nature of the work called for as well as of the form of the contract to be entered into was made available to prospective bidders through a document entitled "Information for Bidders, Contract, Bonds, Certificate, Specification, Forms of Proposal for the Construction of a Portion of the Joint Sewage Works for the Overpeck Valley, Bergen County, New Jersey." Among other things, the bidders were advised that they must inform themselves *484 fully of the "conditions relating to the construction and labor under which the work is now or will be performed"; also that they would be presumed to have inspected the site and to have read and become thoroughly familiar with the contract documents and that they must acquire and rely exclusively upon their own information as to the physical conditions and in particular the subsurface conditions.
Terminal Construction Corporation and Young Foundation Corporation jointly were the successful bidders, and on August 12, 1949 they executed the contract with the Authority. Subsequently the Young Corporation assigned its interest therein to Terminal.
The contract provided, among other things, that the engineer (which term was declared to mean Bogert-Childs Engineering Associates, or their duly authorized representatives),
"shall make all necessary explanations as to the meaning and intent of the specifications and drawings, shall give all orders and directions contemplated by the contract; * * * shall determine in all cases the amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for; shall determine all questions in relation to said work and the construction thereof, and shall decide in all cases every question which may arise relative to the fulfillment of this contract on the part of the contractor. His estimate and decision shall be final and conclusive upon the contractor, except as provided by Article I, and in case any question shall arise between the parties hereto, touching this contract, such estimate and decision shall be a condition precedent to the right of the contractor to receive any money under this contract. * * *."
During the progress of the work disputes arose between Terminal and Bogert-Childs Associates, and between Terminal and the resident engineer assigned to the project as the representative of Bogert-Childs Associates. These disputes eventuated in the litigation presently under review.
The original complaint in the action was filed on September 10, 1951, while the work was still in progress. It contained two counts, the first one of which may be described generally as a claim arising out of alleged breach of contract; the second one was on a book account.
*485 On February 11, 1952, an amended complaint was filed reciting that the work was still uncompleted and that further moneys had become due. The issues presented by the two counts remained the same.
Finally, about a year after the institution of the action, a second amended complaint was filed. It is a much more elaborate one than either of the others and contained five counts.
The first count charges that the work was completed on November 1, 1951, at which time Terminal became entitled to a balance due under the contract of $294,913.38, which the Authority had refused to pay. For the first time an allegation was included that the refusal to pay was actuated by the fraud of the Authority and the engineer referred to in the contract. The specific charge appearing in the complaint is:
"10. Defendant and the engineer as referred to in the contract, willfully, illegally, fraudulently and contrary to the contract, refused to approve payments, all to the damage of the plaintiff."
The same language appears in each of the five counts. No specification of the nature of the fraud is set out. Vide R.R. 4:9-1. Nor was it set out any more definitely in the pretrial order.
The second count alleges that Terminal performed certain extra work at the authorization of the agent of the Authority under an agreement to pay therefor. And a recovery is sought in the amount of $216,535.59 which it is said the Authority and its engineer had illegally and fraudulently refused to approve.
The third count alleges that the Authority by its engineer ordered the plaintiff to perform wall concrete work contrary to the contract and contrary to plaintiff's schedule of operations, as the result of which damages in the amount of $90,000 were suffered, payment of which has been refused illegally and fraudulently.
The fourth count charges that the Authority by its engineer ordered plaintiff to perform the slab concrete work in a *486 manner contrary to the contract and contrary to plaintiff's schedule of operations. As a result damages in the amount of $39,560 were sustained which the defendant had illegally and fraudulently refused to pay.
The fifth count alleges that the Authority by its engineer requested "changes, additions and modifications in the contract and specifications," which plaintiff undertook. As the result of this "extra work" a recovery of $6,023.88 is sought because payment had been illegally and fraudulently disapproved.
The Authority admitted that a certain balance was due under the contract to Terminal, a tender of which had been made and refused. However, by stipulation during the course of the trial, payment was accepted without prejudice.
Further obligation was denied and in addition the Authority asserted that if Terminal were entitled to any recovery, there should be deducted $22,273 for defective work, and $23,700 representing liquidated damages under the contract for delay in completion of 237 days at the agreed rate of $100 per day. This total sum of $45,973 had already been deducted from the final payment made to Terminal. Consequently it was necessary at the trial to submit to the jury for separate finding the problem of the amount of the set-off, if any, to which the Authority was entitled.
After a protracted trial, during which the third and fourth counts of the complaint were dismissed by the court, the jury returned a verdict in favor of Terminal on its claims in the amount of $414,257.71. In addition, a special finding was made that only $5,786.39 of the deducted $45,973 should be allowed. As a result the difference of $40,186.61 was added to the verdict for Terminal and a total judgment of $454,444.32 was entered in its favor.
The Authority now appeals from the adverse judgment and Terminal has cross-appealed from the dismissal of the third and fourth counts of its complaint.
A major factor at the trial involved the nature and extent of the authority conferred by the parties upon the engineer under the clause of the contract already recited. It will be *487 observed that by their voluntary agreement they conferred upon Bogert-Childs Engineering Associates or their duly authorized representatives authority to make final and conclusive decisions with respect to the meaning and intent of the specifications and drawings, the amount, quality, acceptability and fitness of the several kinds of work which were to be paid for, all questions in relation to the work and the construction thereof and relative to the fulfillment of the contract by the contractor. And more specifically it was agreed that as to all questions "touching the contract" the estimate and decision of the engineer would be a condition precedent to the right of the contractor to receive any money under the contract.
Such a stipulation is a common one in modern construction contracts and decisions made thereunder by the person named have long since been regarded as dispositive of disputes between the parties, in the absence of clear proof of fraud upon the part of such person. T. Foster Callahan, Inc., v. Commissioners., etc., Union Twp., 102 N.J.L. 705 (E. & A. 1926); Landstra v. Bunn, 81 N.J.L. 680 (E. & A. 1911); Sheyer v. Pinkerton Construction Co., 59 A. 462 (N.J.E. & A. 1904, not in official reports); Bradner v. Roffsell, 57 N.J.L. 412 (E. & A. 1894); Chism v. Schipper, 51 N.J.L. 1 (Sup. Ct. 1888). Fraud in this connection has a broader connotation than is ordinarily implied. In addition to its ordinary significance, in construction contracts it includes arbitrary action and gross mistake. 9 Am. Jur., Building and Construction Contracts, § 34; Restatement of the Law, Contracts, § 303.
Where such ground is not established, failure to obtain the engineer's certificate or a favorable decision from him precludes recovery. However, when fraud is proved, the legal significance thereof is that the necessity for favorable action of the engineer is eliminated as a condition precedent to the maintenance of the suit, but the contractor still has the burden of demonstrating the breach of the contract and his right of recovery.
*488 In instructing the jury no explanation was given as to the significance of the engineer's power of final decision nor as to the relation between the charge of fraud and the need for proof of fraud in the absence of a favorable decision from the engineer. On the subject of fraud, the court merely said:
"With reference to all counts and to all claims generally, Terminal charges * * * that the engineer acted arbitrarily and fraudulently and particularly with reference to his failure to present the bills which were submitted by Terminal and the claims which were submitted by Terminal to the Authority for their approval. I think Mr. Lincoln himself said that he, in many instances, didn't discuss it with the Authority or didn't present these claims to the Authority. And Mr. Bogert himself said that specifically with reference to the items in the last count, that none of those were presented to the Authority for their approval or disapproval, even though they had said they would do so. Terminal says that Mr. Lincoln acted fraudulently and without the use of reasonable discretion and that his fraud is attributable to the body for which he acted as agent."
This portion of the charge seems to have been left in isolation for such consideration as the jury saw fit to give it. And the impression to be gathered is that even if no fraud was found, recovery could be had on any claim arising out of a dispute between the contractor and the engineer, if the jury agreed with the contractor's construction of the contract or its claim as to the authority of the engineer. No particular objection was made to this portion of the charge and it is mentioned for guidance at the retrial which is hereinafter ordered.
It is plain, moreover, from the language of the compact that Bogert-Childs Associates was not the agent of either the Authority or of Terminal. Rather the firm occupied the status of independent arbiter between them for the purposes specifically agreed upon. Bradner v. Roffsell, supra. The fact that it drew the specifications and had a hand in the preparation of the information for the bidders and in the fashioning of the contract was not a legal obstacle to the assumption of this position so long as the parties voluntarily agreed thereon. Cf. Jones v. St. John's College, 6 Q.B. 115, 124 (1870).
*489 The trial court in his charge on the subject of the relationship between Bogert-Childs and the Authority, and particularly the relationship between the Authority and Robert Lincoln, an employee of Bogert-Childs who was assigned by it as resident engineer on the project, advised the jury that:
"You will have the contract before you and you can refer to Article 29 and see exactly how far his powers extended in connection with his work under this contract."
He charged also that:
"With further reference to all counts and claims generally, Terminal charges * * * that Mr. Lincoln was the agent acting for and in behalf of the Sewer Authority and within the scope of his real or apparent authority * * *."
And:
"With reference to all counts and claims generally, the Bergen County Sewer Authority maintains that Lincoln was not its agent and that they were not bound by any of his actions; that the work for which claims are made were extra work items and required formal work orders from the authority to bind it to payment; that Mr. Lincoln had no authority to obligate the sewer authority in financial matters as his powers and duties were fully set forth in the contract and Terminal had full knowledge of Mr. Lincoln's proper powers and duties; * * *."
Farther along, the court said:
"If, after considering all of the evidence that has been produced before you, you find that the plaintiff, Terminal Construction Corporation, has sustained the burden which the law casts upon it and by the greater weight of the evidence the Terminal Construction Corporation has satisfied you that it is entitled to collect for all or any part of the claims set forth in the several counts of the complaint, then of course the plaintiff is entitled to recover a judgment in such amount as may be justified in the evidence and that amount can be in any amount up to or less than the sum total of its aggregate claims. * * *."
In its total effect and in spite of the language of the contract, this charge permitted the jury to find that Lincoln was the agent of the Authority in ordering and directing *490 much of the work which formed the basis for the contractor's claims. And a favorable verdict for Terminal was authorized if such a finding were made.
Obviously Lincoln's status rose no higher than that of his employer Bogert-Childs. Nowhere in the record is there any proof of an authorization express or implied running directly from the Authority to him. According to Ivan Bogert, one of the members of the engineering firm, Lincoln was its employee and a subordinate on the project; specifically he "was in charge of the supervision of the field inspection forces, and in charge of the review and checking of contractor's estimates." (One possible exception to the absence of agency between the Authority and Bogert-Childs or Lincoln arose out of the authorization under Article 55 to the contractor to act in an emergency. However, it is not material on this phase of the case and will be discussed later in connection with one of the claims sued upon.)
Terminal's president was under no misapprehension as to Lincoln's authority to depart from the contract or specifications or to order the doing of extra work, because months before the largest claim presented here was incurred he wrote to Bogert-Childs:
"* * * Mr. Lincoln has told the writer personally many times in the past that he is invested with no powers whatsoever with reference to moneys, and that his job is solely for construction supervision and procedures. * * *."
And on another occasion Terminal's office manager in correspondence with the same firm called attention to the fact that the engineer had no authority to order the contractor to proceed with extra work or changes in the work because, under Article 36 of the contract, such an order must come directly from the Authority and be approved and countersigned by it.
Under the circumstances we conclude that it was error to submit to the jury for determination the issue of agency between Lincoln and appellant. It is somewhat doubtful from an examination of the language employed in noting *491 the objections to the charge that this criticism was called to the court's attention particularly. In any event, appellant submitted a request to charge to the effect that Bogert-Childs and Lincoln "are not agents of the Bergen County Sewer Authority." This was denied and objection noted.
Another request inconsistent with the refusal just referred to was charged. Under it the jury was instructed:
"That Bogert-Childs Engineering Associates are independent contractors engaged to perform functions designated in the contract between the parties."
The court refused to charge:
"64. That Mr. Robert Lincoln is an employee of Bogert-Childs Engineering Associates employed to perform part of this contractual duty of contract supervision."
It cannot go unnoticed that the case had many complexities which rendered the task of charging the jury unusually difficult. But we are constrained to hold that the instructions on the subject of agency were erroneous and must have been confusing and misleading to the jury. Middleton v. Public S. Co-ordinated Transport, 131 N.J.L. 322 (E. & A. 1944); State v. Erie R. Co., 84 N.J.L. 661 (E. & A. 1913). For this reason a reversal of the judgment for respondent must be ordered.
Since the action must be remanded for a new trial, it seems advisable to review the individual claims advanced under the various counts of the complaint and the general charge of fraud with respect thereto.
The first count presents three separate claims: (1) for $36,771 representing 8,755 cubic yards of dirt excavated for which no payment had been made; (2) for $134,336.25 representing 113,425 cubic yards of earth fill allegedly put into an embankment, the construction of which was called for by the contract; (3)(a) for $8,540 representing 17,080 pounds of structural steel used but not paid for, and (b) $16,853 covering 33,706 pounds of miscellaneous fabricated steel used and not paid for.
*492 The second count claims $216,535.39, allegedly for extra work made necessary by the unusual and excessive flow of water from the nearby Hackensack River into the site of Terminal's work.
The demands of the third, fourth and fifth counts are as set forth above, except that at the trial the amount sued for on the fifth count was reduced to $2,980.55.

FIRST COUNT

I.

Excavation
It being obvious that excavation would be a necessary incident of the structures to be built, measures were taken to estimate the extent thereof before bids for the various parts of the project were sought publicly. To accomplish this, preliminary survey work was done at the site by one Florio Job, the engineer of the Borough of Little Ferry, who was not an employee of either the Authority or of the project engineer. Then "a complete engineering estimate" was made by employees of Bogert-Childs. As a result, when bids were called for the form of proposal set forth that the "estimated quantity" of earth excavation involved was 76,000 cubic yards and a bid price per cubic yard, called a unit price, was sought.
Paragraph 24 of the "Information for Bidders" required the bidders to "satisfy themselves by personal examination of the location of the proposed work, and by such other means as they may choose, as to the actual conditions and requirements of the work and the accuracy of the estimate of the Engineer, and shall not, at any time after the submission of a bid, dispute or complain of such statement or estimate of the Engineer, nor assert that there has been any misunderstanding in regard to the nature of the work or the amount of the work to be done." And by paragraph 23 thereof public notice was given that the quantities were approximate only and set forth as a basis for the uniform comparison of bids.
*493 Section 1.16 of the specifications attached to the contract provided that for measurement purposes the quantity of dirt excavated would be the "actual number of cubic yards of earth contained between surfaces represented by (a) the original surface of the ground, (b) the underside of the masonry in earth, * * * and (c) vertical planes defined by the outermost footing of the structure * * *." And it was also stipulated in section 1.6 that "excavations carried beyond the lines and grades shown on the drawings or established by the Engineer together with its disposal shall be at the contractor's expense."
It was further agreed that the contractor was to submit estimates of the work done the previous month and upon approval thereof by the engineer, partial payment of the contract price would be made by the Authority. Provision was made also that all of these estimates and payments were subject to correction at the time of the semi-final payment, which was to take place within 30 days after the filing of the certificate of completion by the engineer.
During the first 12 months of excavation monthly estimates of the dirt removed were submitted, approved by the resident engineer Lincoln and paid for. The last of these 12 estimates, covering September 1950, was approved for a cumulative total to that time of 72,900 cubic yards.
However, when the thirteenth estimate was submitted for October, seeking payment for 6,130 additional yards, the record indicates a realization on the part of Lincoln that the cumulative total claimed of 79,030 cubic yards was already beyond the gross estimate of 76,000 cubic yards set down in the form of proposal, and that although the contractor "was pretty well along" there was a considerable amount of excavation yet to be done. Upon consultation with his superiors, he received instructions to cut back the estimate to that of the previous month, namely, 72,900 cubic yards.
Thereafter and through the twentieth estimate for the period ending June 30, 1951, although the total claimed yardage was increased only by 2,514 cubic yards, Lincoln pursuant to orders held the estimate at 72,900. The twenty-first *494 estimate for the month of July 1951 increased the claimed excavation to a total of 82,199 cubic yards and Lincoln with approval of his superiors increased the allowance to 76,000, the gross estimate in the proposal.
The twenty-second and twenty-third estimates for August and September 1951 for some reason dropped down to 81,574, that of October went up to 82,350 and remained at that figure from October 1951 through the last estimate which was submitted in January 1952.
During the period between June 1951 and January 1952 a separate excavation item was set up designated "Earth excavation at Lagoon." Terminal's estimates for this work totaled 13,469 cubic yards. So the total excavation claim was 95,819 cubic yards.
The controversy over the quantity of earth removed which qualified for payment was a sharply defined one. Terminal used the open-cut method of excavation, as it had the option of doing under the contract. Lincoln asserted that earth removed from the sloping sides of the excavations exceeded the specified payment lines and he called attention to the requirement that the measurements must be based upon vertical planes defined by the outermost footing of the structure.
Furthermore, on April 14, 1950, the contract was supplemented to provide that the deep section of the pump and blower house of the plant would be built within a temporary cofferdam of steel sheet piling. In consideration of the relinquishment by Terminal of the open-cut method of excavation for this portion of the project, and for the extra labor and materials, the Authority agreed to pay an additional sum of $38,400. This supplement provided that in all other respects the original agreement remained unchanged.
Terminal's president conceded in part of his testimony that in excavating within this cofferdam the payment lines established by the original agreement were exceeded and that in this area computations of excavation were not according to the contract. (The record does not show the extent of this departure measured in cubic yards of dirt.) But he maintained *495 that this was necessary and should be paid for in spite of the fact that the supplemental agreement made no provision therefor.
In any event, the evidence shows that as the contractor's work neared completion, at Lincoln's request his firm had a recomputation made of all the excavation work. The surveyor, Florio Job, who had performed the preliminary work in connection with the excavation estimate before bid tenders were sought, made a complete survey of the area. Then another Bogert-Childs engineer took Job's field notes, together with a survey prepared by Terminal before the work was begun, and the contract test for payment, and he computed the volume between the surface before the work was begun and the bottom of the structures. This gave the excavation to be paid for and the computation brought the allowance therefor up to 87,064 cubic yards in contrast with the estimates totaling 76,000 cubic yards which had been approved by Lincoln and the estimates totaling 95,819 cubic yards submitted by Terminal. In the certificate of substantial completion submitted by Bogert-Childs to the Authority the allowance of 87,064 cubic yards was approved for payment and paid.
Since the parties had expressly bound themselves by the contract to accept as conclusive the engineer's determination with respect to the quantity of excavation, in our judgment the contractor is bound thereby unless the decision was prompted by fraud or gross mistake.
As already indicated, the belated charge of fraud appearing in the third complaint was not particularized factually. And the pretrial conference order did not improve the situation.
At the trial the president of Terminal was on the witness stand for five days. His direct, cross and redirect examination, which was very lengthy and detailed, covers 343 pages of the appendix. At the very end of his redirect examination an inquiry was made by his counsel as to whether he recalled "a certain different type" conversation he had with Lincoln. And the witness testified that in about February 1951, some *496 months after the first excavation estimate cut back, he said to Lincoln:
"* * * Bob, * * * you have three months now, three or four months, to substantiate these quantities. I offered you our services of our engineers, our field books, anything you want, and you still give me no answer, yes or no on item 1 and 3. I have to pay all these men and all these machines every week. When do you intend for me to get paid? This is a long load for me to carry.
He made a statement to me, he said, `What concern is that of mine. Where do I come in if you do get the money?'
So I says, `What are you referring to?'
`Well,' he says, `I only get nine or ten thousand dollars a year.'
I says: `Look Bob, I don't know what your angle is, but I want to tell you one thing. You work for Bogert-Childs. They pay you. I don't pay you. I did the work. We are entitled to payment. We want it.'
And that dropped the conversation.
Mr. Heller: That is all.
Re-cross examination by Mr. Spencer:
Q. Do you mean to charge, Mr. Dinallo, that Mr. Lincoln asked you for money to pass your estimates?
A. No sir, I didn't make that statement."
Another officer of respondent, one Vicinio P. Carnecchia, gave testimony of a similar import. He said the construction was his partner's project, but that he was there on numerous occasions. By coincidence he, too, had an alleged conversation with Lincoln in February 1951, in the course of which in discussing disputed items Lincoln said: "When you are ready to do business with me, I will be ready to deal fairly with you." Carnecchia claimed to have had two similar conversations at later dates and he expressed the opinion that Lincoln was asking for money.
The record discloses that the certificate of substantial completion was issued on August 1, 1952, and revised on August 6, 1952, about 18 months after the alleged first conversation with Lincoln. During this period the Authority, Bogert-Childs and Lincoln were fairly deluged with letters from Dinallo, the originals going to one of the three and copies to the others. These letters related to excavation cut backs and to many other asserted complaints and disputes about various parts of the work. No one of them contained any reference to the alleged bribe-seeking conversations.
*497 There were conferences with the Authority members about various controversies, particularly in connection with the embankment and the dewatering disputes (hereinafter discussed). Dinallo was accompanied by his attorney on at least one of these occasions. Yet at no time did he ever disclose the alleged conversations to Lincoln's superiors or to the Authority. If he felt that Lincoln, who was a subordinate engineer with limited authority, had any influence or decisive authority on the various controverted problems, it is inconceivable that he would not have exposed him as untrustworthy.
Furthermore, and more decisive on the point, these conversations are alleged to have occurred not before the excavation cut backs began but long afterward and when the matter was fully in the hands of Lincoln's superiors, principally the project engineer, Ivan Bogert. And according to Bogert, Lincoln discussed the matter with him before the first cut back and received instructions not to approve the estimate. Moreover, within a few days after the action was taken, Lincoln wrote Terminal explaining that excavations for structures would be paid for under the contract only to the line of the footings extended vertically. Thereafter in every instance such reductions as were made by Lincoln in the monthly estimates resulted from orders given by his superiors. And in every case Dinallo wrote to Bogert-Childs and the Authority protesting the action.
Moreover, all of these estimates and the partial payments represented thereby were specifically subject to correction before the semi-final payment, which was to be made when the work was substantially finished. The record discloses that at Lincoln's suggestion prior to this payment, the entire matter of excavation was recomputed by engineers other than himself who worked on data and surveys with which Lincoln had nothing to do. It was this recomputation which brought the final allowance for excavation up to 87,064 cubic yards.
It is suggested also that fraud is to be found from the testimony that Lincoln declined to take advantage of Terminal's field men's offer to demonstrate during the period of *498 excavation that the claimed quantities had been removed. Here it must be recalled that the supplementary contract for the construction of the deep section of the pump and blower house was made on April 14, 1950. This portion of the excavation manifestly was the deepest of all and it was at this site that Dinallo conceded that the excavation went outside the contractually stipulated pay lines. Consequently it would not have solved the controversy to demonstrate that Terminal had removed the claimed cubic yardage of dirt. No compensation could be allowed for any removal outside the payment lines and Terminal offered no proof to show what the excess yardage in the cofferdam area actually was. On the other hand, Bogert-Childs engineers and the independent surveyor, Job, demonstrated the actual excavation by reference to the available surveys and drawings showing the footings.
Under all the circumstances, the evidence fails to disclose any fraudulent conduct on the part of Lincoln or his superiors in connection with the claim for excavation, or that any alleged fraudulent conduct on the part of Lincoln had any relation to the refusal of his employer Bogert-Childs Associates or of the Authority to pay for the excavation to the full extent of Terminal's claim.
Accordingly, we conclude that the final decision of the engineer, Bogert-Childs Associates, as to the total cubic yardage of excavation for which payment should be made was conclusive on Terminal. Therefore it was error to refuse to grant the motion to dismiss this portion of the first count of the complaint.

II.

Earth Embankment Claim
Section 3.1 of the specifications required the contractor "to compact and grade to the lines shown on the drawings or ordered, embankments around the structures, under the highways at the sewerage treatment plant and at other localities as directed by the Engineer."
*499 Section 3.3 provided that "Compacted embankments shall be constructed in layers not exceeding 12 inches in thickness by approved means and shall be rolled by tractors, bulldozers or by traffic, as approved by the Engineer."
Then followed the two critical sections so far as the claim in dispute is concerned.
Section 3.5 says:
"The contractor shall provide additional material as required to compensate for settlement of embankments."
And section 3.6 says:
"The quantity to be measured for payment under Item 3 shall be the volume of compacted embankment between the original surface and the payment lines shown on the drawings ordered. No allowance will be made for materials in excess of the requirements or for material which has settled."
Item 3 in the form of proposal set forth the engineer's estimate of the quantity of fill which would be necessary to create the embankment. The estimate, which was made on the same basis as the preliminary excavation estimate, was 61,000 cubic yards of fill and Terminal fixed a unit price of $2.25 per cubic yard.
The embankment which is the cause of the dispute was constructed of earth fill laid on the original surface of the ground.
After 12 monthly estimates for fill had been approved and paid, the claimed cubic yardage was already in excess of the preliminary estimate. And as in the case of the excavation, Lincoln, on orders of his superiors, began to reduce the monthly claims which were presented for approval for payment by the Authority. The October claim which raised the cumulative total to 65,117 cubic yards was cut back to 58.287 cubic yards. Thereafter, the reductions continued until the embankment work was completed, apparently at the end of October 1951, at which time the contractor's monthly statements asserted the quantity of fill supplied at 113,425 cubic yards. At the end of this period approval seems to have been given for a total quantity of 74,469 cubic yards.
*500 However, again as in the case of the excavation, a recomputation of the entire embankment fill was undertaken and in the same manner. As a result, the final allowance for such fill was fixed at 53,540 cubic yards. The difference of 59,885 cubic yards at the unit price of $2.25 per cubic yard fixes the deficiency sued for at $134,741.25.
The controversy between the parties over this item centers around the proper construction of the terms "settlement," "compacted embankment" and "original surface."
It seems clear that the intention of the parties was to pay for the amount of fill as finally compacted between the original surface of the ground and the elevation fixed by the appropriate drawing.
An unusual condition developed during the course of the work. The subsoil was swampy, boggy and soft because of underground water. Consequently when the structure had been built the original surface of the ground sank, bearing the entire embankment with it. As one of the witnesses put it, the subsoil walked out from under it like a mud wave. This necessitated the addition of more and more fill as the sinking continued, until firm subsoil was encountered. Thus the additional fill was not due to compaction or settlement within the embankment itself, but rather to the dropping of the entire structure as it rested on its base of the original ground.
The controversy arose from these facts and the issue is readily understandable. Terminal claimed that it was entitled to be paid for the compacted fill between the original surface of the ground as it came to its final and firm resting place and the top of the embankment as fixed by the drawings. Its contention was that the compaction and settlement, for which no payment was to be made under the contract, meant settlement and hardening of the fill within the embankment and not the fill made necessary to compensate for the subsidence of the original surface of the ground which carried the entire embankment with it.
On the other hand, Lincoln and his firm, Bogert-Childs, took the position that it was immaterial whether the settlement *501 took place within the embankment itself or whether the entire embankment settled carrying the original surface with it. They contended that additional fill made necessary by settlement of whatever nature imposed no payment obligation on the Authority.
In dealing with this problem at the trial the contractor produced expert evidence to establish that the word "settlement" as used in the specifications had an established technical meaning in the engineering field. A properly qualified engineer asserted that "settlement" means consolidation due to compressive forces which cause the particles of the material used as fill to become more closely engrained or compacted. He gave the opinion also that when subsoil settles carrying the embankment with it, that is not settlement within the accepted trade usage of the term.
Appellant's witness, Lincoln, did not deny specifically the existence of the alleged trade usage but he did say that as a matter of definition from an engineering standpoint, a dropping of the entire embankment because of subsidence of the subsoil would constitute settlement.
If "settlement" means in the trade what Terminal's witnesses asserted, then the type sinking here (of the whole embankment) would not be covered by that term; nor would such subsidence be comprehended by the words "compacted embankment."
The Authority says that since the agreement provided for payment for the volume of compacted embankment between the "original surface" and the top of the embankment as shown on the drawings, the intention clearly was to create a liability to pay for the fill between the original surface as it was in apposition with the adjoining original surface of the entire area before any fill was placed thereon and the top of the embankment. And it urges that if the original surface sank beneath the weight of the embankment, such sinking was a risk which the contractor assumed, and payment is justified only for the fill between the original surface in its undisturbed location before the sinking and the top of the embankment. If this contention is sound and the embankment *502 sank to a point where its top became level with the surrounding original surface, the contractor would be entitled to no payment at all, no matter how much fill was put in. Such a result would follow, as well as the specific result sought to be imposed here, if the trade usage asserted by Terminal's witnesses does not exist. Cf. Superintendent, etc., of Public School of City of Trenton v. Bennett, 27 N.J.L. 513 (Sup. Ct. 1859). However, if the usage does exist, and it attaches to the contract, then Terminal would be entitled to be paid for the compacted embankment between the portion of the original surface underneath it where that surface finally came to rest, and the top of the completed embankment. Thus, in the context "original surface" bears a close relation to the term "settlement" and depends for its true significance upon the meaning of that term.
In the light of the testimony the trial court submitted the issue of the meaning of the term "settlement" to the jury for determination. This was the proper disposition of the matter. Rodman v. Weinberger, 81 N.J.L. 441 (E. & A. 1911); Calumet Const. Co. v. Board of Education of Hoboken, 78 N.J.L. 676 (E. & A. 1910); Smith & Wallace Co. v. Lunger, 64 N.J.L. 539 (E. & A. 1900); Halsey v. Adams, 63 N.J.L. 330 (E. & A. 1899).
Since resolution of the question involves a construction of the specifications, a further issue must be considered.
As already set forth, by Article 29 of the contract the parties agreed that the "engineer shall make all necessary explanations as to the meaning and intent of the specifications * * * and shall decide in all cases every question which may arise relative to the fulfillment of this contract on the part of the contractor," and "his decision shall be final and conclusive" upon the contractor. Does this provision render final and binding on the contractor the engineer's interpretation of the term "settlement"? We think not.
There appears to be a conflict among the authorities as to whether a provision in such a contract giving authority to the engineer to construe language employed therein is legally *503 valid and binding upon the parties in the event of a dispute. Some courts uphold the validity of the stipulation as well as the conclusiveness of the engineer's interpretation of the contract. United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 74 L.Ed. 256 (1949); Keachie v. Starkweather Drainage Dist., 168 Wis. 298, 170 N.W. 236 (Sup. Ct. 1919); Marsch v. Southern New England R. Corp., 230 Mass. 483, 120 N.E. 120 (Sup. Jud. Ct. 1918); Norcross v. Wyman, 187 Mass. 25, 72 N.E. 347 (Sup. Jud. Ct. 1904); Ruch v. York City, 233 Pa. 36, 81 A. 891 (Sup. Ct. 1911); and see Annotation, 137 A.L.R. 530. However, other jurisdictions regard the construction of a contract to be the traditional prerogative of the judiciary. Consequently, such provisions are condemned as an attempt to oust the courts of jurisdiction. State v. Kisselburg, 27 Ariz. 336, 233 P. 580 (Sup. Ct. 1925); McGillivray Const. Co. v. Hoskins, 54 Cal. App. 636, 202 P. 677 (D. Ct. App. 1921). The earlier cases in New York took this view. Oscar Daniels Co. v. City of New York, 196 App. Div. 856, 188 N.Y.S. 716 (App. Div. 1921); Hanssel v. P. Tomasetti Contracting Corp., 8 N.Y.S.2d 873 (Sup. Ct. 1939), affirmed 257 App. Div. 1031, 13 N.Y.S.2d 565 (App. Div. 1939), reversed on other grounds 283 N.Y. 164, 27 N.E.2d 977 (Ct. App. 1940). But the later decisions seem to adopt a more liberal attitude, at least to the extent of recognizing the decision of the engineer as final where the dispute between the parties centers about the construction of ambiguous language in the contract. Seglin-Harrison Const. Co., Inc., v. State, 267 App. Div. 488, 46 N.Y.S.2d 602, amended 267 App. Div. 926, 46 N.Y.S.2d 602 (App. Div. 1944), affirmed 293 N.Y. 762, 58 N.E.2d 521 (Ct. App. 1944); Chas. S. Wood & Co., Inc. v. Alvord & Swift, 232 App. Div. 603, 251 N.Y.S. 35 (App. Div. 1931), affirmed 258 N.Y. 611, 180 N.E. 354 (Ct. App. 1932).
While the precise problem has not been considered in New Jersey, so far as we have been able to discover, in our judgment the cause of justice would be served by the adoption of a rule which is somewhere between the two viewpoints.
*504 It is only necessary to recall the original and then the changing attitude of the courts toward arbitration clauses in contracts to realize that the modern view is to permit competent parties bargaining at arms' length to make their own binding stipulations with regard to the subject matter of their negotiations, unless some strong public policy operates as a bar. Therefore it is our view that where such a contract confers the quasi-judicial authority on an engineer to make a binding construction of the language thereof in the absence of fraud or arbitrary action, his interpretation should be considered final in any case where the meaning of the language is ambiguous. Cf. Broward County Port Authority v. Arundel Corp., 206 F.2d 220 (C.C.A. 5 1953); Foster Co. v. Commonwealth, 318 Mass. 190, 61 N.E.2d 147 (Sup. Jud. Ct. 1945). This would seem to be consonant with the philosophy represented by our Arbitration Act, N.J.S. 2A:24-1 et seq., even though strictly speaking the engineer's action is not such an arbitration. However, where the language is clear and a dispute arises as to its significance, the engineer, even if acting in good faith, cannot construe it contrary to its unmistakable connotation or contrary to any fixed meaning that the language has in the law or in trade usage. Cf. State Highway Dept. of Georgia v. Mac Dougald Const. Co., 189 Ga. 490, 6 S.E.2d 570, 137 A.L.R. 520, at page 528 (Sup. Ct. 1939).
Applying this principle here, we hold that in construing the language of the specifications, the engineer must act judicially and not arbitrarily. And if certain terms employed in the contract have a fixed and well known connotation in the trade, he is bound by that usage unless it is excluded or qualified by appropriate language. In such a situation he cannot make an interpretation at odds with the fixed meaning of the terms. If he does so, his action would be non-judicial and classed as arbitrary even though made in good faith. Cf. Redlon Co. v. Franklin Square Corp., 89 N.H. 137, 195 A. 348 (Sup. Ct. 1937), affirmed on rehearing 89 N.H. 137, 197 A. 329 (Sup. Ct. 1938); Passaic Valley Sewerage Comm'rs v. Tierney, 1 F.2d 304 (C.C.A. 3 1924).
*505 However, in addition to his authorization of a jury finding as to the meaning of the parties on this subject, the court also submitted in general terms the charge that the action of the engineer was actuated by fraud. This was error.
In this connection Terminal refers to the alleged bribe attempts and suggests that the engineer's conduct was fraudulent and arbitrary because of failure to observe certain tests conducted at Terminal's instance in order to demonstrate that the entire embankment was settling, making necessary additional fill which qualified for payment under the contract; and further, because the engineer continued to refuse approval of monthly estimates when he knew that the fill was actually being used. But the record discloses clearly the basis for the controversy on this point, that Lincoln's superiors had established the engineer's position and that the Authority was well aware of the nature of the controversy.
We find no justification for the submission of the issue of fraud to the jury. However, if reference to it had been omitted, the charge of the court as to the construction of the term "settlement" would have been an adequate treatment of the matter.
Accordingly, there must be a reversal and a retrial as to this phase of the first count also.

III.

Structural Steel and Fabricated Steel Claims
In the information for bidders, estimates of the project requirements of miscellaneous structural steel and miscellaneous fabricated steel articles were set forth. Item 14b relating to the structural steel listed the estimated quantity at 1,000 pounds, and item 14d covering the fabricated steel put the estimated quantity at 27,000 pounds. The unit price bid by Terminal was $.50 a pound.
At the trial Terminal claimed installation of 18,441 pounds of structural steel under item 14b. The allowance in the certificate of substantial completion was 1,361 pounds. The demand for the difference at $.50 a pound was $8,540.
*506 Also under 14d the total poundage of fabricated steel for which payment was sought was 77,007 pounds. Allowance of 43,301 pounds was made. The difference of 33,706 pounds represented an additional demand of $16,853.
After a number of monthly estimates covering these 14b and d steel items had been approved, it was realized, according to Lincoln, that much of the steel supplied was to be paid for in the lump sum figures for a number of items. This was reported to his firm and as a result cut backs were made. Finally, another engineer on the staff checked the locations of use of the steel and computed from the drawings the actual poundage which was employed as a part of installations which were lump sum items. Then allowance was made in the certificate of completion for the actual quantities used under items 14b and d, by deducting the poundage of steel required to be included as integral parts of lump sum installations from the total steel used.
To illustrate: Terminal included in its total bid price $7,585 for item 121e, "Interior piping system in chlorine house." The specifications, section 121.1, say:
"Under the subdivisions of item 121, the Contractor shall furnish, install and test the pipe systems, comprising all pipes, pipe fittings, couplings, wall castings, pipe insulation, supports, pipe hangars, and other fastenings, all regular and special valves, valve stands, appurtenances and other operating devices within the buildings, and tanks at the treatment plant, with the exception of those specifically included in other items of the contract.

* * * * * * * *
Under sub-item 121e shall be included the pipe system in the chlorine house, and to points two feet beyond the outer walls, including galvanized wrought iron pipe to float wells and extra heavy black genuine wrought iron pipe for chlorine gas headers."
Despite this requirement the contractor claimed payment for 6.653 pounds of pipe and fixtures used in the chlorine house piping system. Bogert-Childs took the position that it was included in the lump sum item and to recognize the claim would be to pay twice for the same material.
Without detailing the precise locations, there were 13 other places listed by the engineers where the structural steel and *507 fabricated iron (as it seems to have been designated in Terminal's Monthly Estimates) representing the claim of the contractor were included in lump sum items.
Aside from the fact that the testimony of the contractor's president is extremely indefinite with respect to this claim and the factual support therefor, it is plain from the stipulation relating to the powers of the engineer that Bogert-Childs had the right to make a binding interpretation of the contract in settlement of the dispute in the absence of fraud or arbitrary action.
There is no suggestion here, indeed no basis for one, that the engineer construed the contract in violation of its clear language or contrary to language to which a fixed trade meaning had become attached, as in the case of the embankment.
We find no evidence of fraud or capriciousness on the part of the engineer or any basis for a finding of any relation between any alleged fraud and the withholding of the demanded payment for the material in question. In this situation, if contracts such as these are to have any substantial utility in our industrial life, the courts should uphold as final the engineer's decision. Cf. Choctaw & M.R. Co. v. Newton, 140 F. 225, 233 (C.C.A. 8 1905).
Under the circumstances, the motion for dismissal should have been granted as to this portion of the first count.

SECOND COUNT

Dewatering Operation
As already indicated, the entire project was divided into 18 separate contracts and Terminal was awarded the portion known as contract No. 1.
Contract No. 6 called for the installation of 1,238 feet of 60-inch sewer extending from the screen chamber at the sewage treatment plant, then beneath the Hackensack River, to a point west of the tracks of the Susquehanna & Western Railroad in the Borough of Ridgefield. This undertaking *508 was assumed by another contractor, Greenland & McCullough, Inc.
Greenland & McCullough, Inc. qualified before Terminal and was ordered to proceed by Bogert-Childs. Article 10 of the contract required the work to begin within ten days after receipt of this notice.
Article 39 of Terminal's agreement reserved to the Authority the right "to do any work which may connect with, become part of, or be adjacent to the work embraced in this contract, at any time, by contract or otherwise. * * *" It further provided:
"This contractor must work in conjunction with and in cooperation with all other contractors at the site of the work to be performed hereunder, to avoid disputes and to secure the rapid progress of the work under this contract and under all other contracts. If work under this contract endangers or interferes with any structure or a part thereof, any equipment or a part thereof, or with a permanent installation of any nature whatsoever, whether any of the foregoing are the work of this contractor or of the other contractors, such dangers and interferences shall be prevented or eliminated by adequate protection or removal; all necessary reconstruction or relocating shall be done as directed by the engineer unless the contract documents specifically exempt the same. Any and all such protection, relocating, and or construction deemed necessary shall be at the expense of this contractor. The contractor shall have no claim for damages against the Authority because of action by the Authority under this article and his only right shall be to apply for an extension of time for completion.
Should the contractor sustain any damage through any act or omission of any other contractor having a contract with the Authority for the performance of any work upon or at the site of the work to be performed hereunder or of any work which may be necessary to be performed for the proper prosecution of the work to be performed hereunder * * * this contractor shall have no claim against the Authority for such damage but shall have a right to recover such damage from the other contractor under the provision similar to the following provision which has been inserted in the contracts between the Authority and other contractors who are performing or who will perform work upon or at the site of the work to be performed hereunder. * * *"
When the order to proceed was given to Greenland & McCullough no beginning point was designated by the engineer, so far as the record shows. It appears that one end of the sewer was to connect with the screen chamber of the *509 sewage treatment plant when completed by Terminal. This location was approximately 200 feet from the Hackensack River. Greenland & McCullough, Inc. began to lay the pipe there, working from that point toward the river.
The ground in the area was boggy and marshy. Consequently, the pipe was laid in sections in a cofferdam. A cofferdam is an enclosed chamber constructed by driving interlocking steel sheeting into the ground to the required depth; its purpose was to keep out dirt and water during excavation and the laying of the pipe. The pipe was deposited on a gravel bed; then when the particular section was completed the excavation was back filled and a new section was begun, again in a cofferdam. The work progressed in this step by step fashion until the pipe was laid under and across the river.
Where the pipe began Greenland & McCullough built its cofferdam in a T-shape so that Terminal's cofferdam, within which the pump house was to be built, could be readily tied in, the horizontal part of the T becoming a part of Terminal's structure. However, some months intervened before Terminal was ready to tie into this already existing sheeting and in the meantime an excessive flow of water had produced a difficult problem.
It appears without substantial dispute that water from the river followed the course of the pipe, seeping in, under and around it, with the result that an unexpected flow of water began to come into the cofferdam of contract No. 1. According to one of Terminal's engineers, this happened because Greenland & McCullough had laid the pipe on a porous gravel base and in excavating had removed all of the impervious material and replaced it with porous backfill.
The question as to whether Greenland & McCullough's method of construction constituted proper practice or was negligent, was not pursued to any substantial extent at the trial. The evidence discloses, however, that Terminal's president notified that contractor and its bonding company of a claim arising out of the water problem. It appears also that Greenland & McCullough became insolvent.
*510 In any event, when the time arrived for Terminal to mesh its cofferdam with the T-shaped end of that of Greenland & McCullough, an unusual condition had developed. The nature of the soil, the additional water flow from the river, and the pressure of the earth embankment against this end of the cofferdam had caused the sheeting to shift and incline forward at such an angle as to make a tie-in impossible.
It was essential that Terminal complete its cofferdam but it could not do so with the existing sheeting in the inclined position. Moreover, because the sheeting had shifted Lincoln feared that the sewer itself had shifted also or had become damaged, and he was apprehensive that if Terminal began to drive in its sections of sheeting, further damage might be done to the piping. All of the parties, including the Authority, seemed to be aware of the problem, and Terminal made clear that it declined to accept responsibility for damage to the existing pipe installation which might come about through the insertion of its sheeting.
Lincoln said he feared the water problem, the possibility of existing damage to the sewer through its shifting, the risk of further damage if some measures were not taken, and the risk of damage if Terminal began to drive the remaining segments of its cofferdam. In his language:
"I had to do something quick, not only to get the job going but to prevent an accident or some situation where the whole thing would blow up there. It was a very serious situation, in my mind."
So he issued the memorandum or work order of August 3, 1950, which forms the real basis for the claim under this count.
This memorandum was issued without any direction from either the Authority or his superiors and was never approved by the Authority as an extra work order as required by Article 36 of the contract. It said:

"* * * * * * * *
2. You are also directed to extend your cofferdam across the front of the existing cofferdam constructed under contract No. 6 at the entrance of the 60" trunk sewer to the screen chamber without connecting *511 to the existing sheeting, but removing such portions of said sheeting as may be required for clearance, and as approved by the undersigned. You will also place such temporary timber bulkheads, sheeting and bracing as may be required to retain the existing embankment and materials around the 60" trunk sewer, and as approved by the undersigned.
3. Work listed in paragraph 2 above, other than that required by your agreement with the Bergen County Sewer Authority for the construction of the steel sheeted cofferdam, and consisting essentially of the removal of portions of the existing steel sheeting and bracing of fill, will be approved for payment by the undersigned as extra work; the amount of compensation to be pursuant to Article 36c of the contract and as approved by the Bergen County Sewer Authority."
Terminal proceeded with the work as directed. When the displaced contract No. 6 sheeting was removed the water poured into its cofferdam and continued to do so for some time thereafter. As a result it was necessary to rent and use a number of additional and larger pumps to cope with the flow and to dewater the cofferdam. And in addition temporary bulkheads, sheeting and bracing had to be placed to protect the sewer against the movement or collapse of the existing embankment around it.
Seven bills were submitted for the work allegedly done by virtue of the August 3, 1950 order, between that date and June 27, 1951. Primarily they were for the de-watering operations and they totaled $216,535.59.
The Authority declined payment, apparently predicating its refusal upon (1) Lincoln's lack of authority to issue the order, (2) lack of compliance with Article 36 of the contract which governs extra work orders, and (3) the claim that all of the bills represented fulfillment of obligations imposed by the original contract.
Article 36 dealing with extra work provides that "the Authority may at any time, by a written order * * * require the performance of such extra work or changes in the work as it may find necessary or desirable." It regulates the manner of payment for such work in various ways, and under section (c) the statement is that if applicable unit prices are not set forth in the contract and the parties cannot agree thereon or on a lump sum, the contractor shall receive his *512 true cost plus 10% thereof. And the engineer is designated as the arbiter to determine the cost of the work. Finally, the Article says that "No such order for work or materials so issued by the Authority shall be valid unless first approved and countersigned by the Authority."
As to the claim that the work represented by these bills was ordinary contract work, the Authority relied on section 1.17 of the specifications which stipulates that the price per cubic yard shall "cover all costs of excavation of earth * * * pumping and drainage, temporary sheeting, and all other costs incidental to the excavation of earth, and maintaining the excavation in a safe condition until backfilled."
Article 39, set forth above, formed a further part of this contention, the assertion being that it imposed a duty on the contractor to perform the work for which the recovery is sought and that in any event it required Terminal to look to Greenland & McCullough, Inc. for payment for work occasioned by that contractor's improper construction methods.
The last amended complaint herein sought recovery on the theory that the memorandum of August 3, 1950 was an extra work order issued by the Authority through its agent Lincoln. But it is plain that Lincoln had no such authority and that extra work orders were not binding unless issued in conformity with Article 36. And it is undisputed that no such order was issued.
However, at the trial Terminal maintained also that the August 3 memorandum was valid as an emergency order under Article 55. This Article provides:
"In an emergency threatening injury to persons or damage to the work or any adjoining property, the contractor may act, to prevent such threatened injury or damage, and will so act if instructed or authorized by the Engineer. The amount of reimbursement merited by the contractor on account of any such action shall be determined by the Engineer."
Lincoln was cross-examined about this clause and the existence of an emergency without objection. And the court submitted the issue to the jury for determination. The appendix shows that an objection was registered to this portion *513 of the charge on the ground that there was no proof of an emergency and no such theory of action set forth in the complaint.
The latter ground seems to be well taken so far as the complaint is concerned. Examination of the pretrial order, however, discloses language which is sufficiently broad and general as to encompass the claim of emergency. And following the long and exhaustive trial, in our judgment the interests of justice were served by treating the matter as a problem for jury determination. Moreover, the action of the trial court in this regard is not argued as a ground of appeal.
The authority of the engineer, and in this instance of Lincoln as the resident engineer and representative of Bogert-Childs, to act in an emergency stems directly from the contract. It was an ever present power and required no specific approval from the Authority either before or after such an order was given.
Specifically, the circumstances surrounding the issuance of the order and the testimony of Lincoln as to the reasons which prompted it, in our opinion support the conclusion that the jury should determine if an emergency existed within the contemplation of the contract. Aside from this issue, we find no justification for recovery on the August 3 order either as an extra work order under the contract or on any other basis suggested by Terminal.
There is a serious and substantial dispute as to whether the additional work called for by Lincoln's order justified the extremely substantial bills presented. Terminal contends that they all trace to it, and further that Lincoln not only approved the rates to be paid for the rental and purchase of equipment and for the services of a sub-contractor, but that he also ordered his subordinates to keep a precise record of the time spent and the equipment used and never challenged the reasonableness of any of the bills.
On the other hand, Lincoln's position is that while he did approve the rates as suggested, all the work contemplated by the order was completed by September 25, 1950, somewhat less than eight weeks later, and that any de-watering thereafter *514 was unrelated thereto. And support for this contention is derived from a letter from Terminal's president to Bogert-Childs dated November 2, 1950, requesting an eight weeks' extension of time to complete its contract based on "the complete stoppage of construction work on the cofferdam required under contract No. 1, in order to perform work required by the Resident Engineer as per field memorandum, dated August 3, 1950."
The testimony of Terminal's general superintendent in charge of construction, John Dioguardi, discloses also that by September 25, 1950 the deflected sheeting of No. 6 contract which had interfered with the construction of their cofferdam had been extracted, and the temporary bulkheads, sheeting and bracing to retain the embankment around the sewer had been completed. Terminal then completed the river side of their cofferdam by running it past the braced and shored No. 6 structure. It is not entirely clear from the record whether this, too, was constructed before September 25, 1950.
In any event, the contention of Lincoln seems to be that once Terminal's cofferdam had been run past the trouble point of the sewer pipe and the deflected sheeting, and then completed, no further claim for de-watering is justified under his order. There is testimony about some unusually high tides around this time and also evidence that water came over the top of Terminal's cofferdam. With respect to this the Authority contends such de-watering is not chargeable to the August 3 order, and further, that it could have been prevented by splicing additional sheeting to the cofferdam at this point so as to increase its height and thus prevent the inflow of water.
It is difficult to understand how the very substantial charges for de-watering after Terminal's construction had passed by the point of interference by the No. 6 sewer and sheeting, can be attributed to Lincoln's order, but under all of the conflicting proof the problem is one for determination by the jury.
It must be said that the language of Lincoln's memorandum is more indicative of an intention to issue an extra work order *515 than an emergency order. But if it was issued in fact to cope with an emergency, then the jury would be justified in treating it as such rather than an attempted extra work order given in the face of a crisis in the hope that the Authority would subsequently approve it and pay for the work required.
Article 55 says that the engineer shall determine the "reimbursement" due the contractor for emergency work. And the August 3 memorandum by reference to Article 36(c) prescribes that the engineer shall be the arbiter "to determine the cost to the contractor of the extra work which cost would form the basis for the addition of a 10% profit."
Lincoln said that he computed the contractor's cost at $20,469.72. However, his superior, Bogert-Childs, never actually made any recommendation for payment thereof to the Authority. It seems likely that the engineer's failure to act was brought about by the decision of the Authority that all of the work was a regular part of the contractor's existing burden under the original contract.
The effect of this situation and the refusal of the Authority to approve any payment was to justify Terminal in seeking to recover for the reasonable value of its services.
On this subject it is noted that in charging the jury the trial court referred to the contractor's claim as being in the amount of $216,535.69 under this count, and to the contention of the Authority that if any sum was recoverable, the "reasonable charge" was in the neighborhood of $20,000. Then farther on in the charge the jury was advised that if they found in favor of Terminal and that it
"* * * Has satisfied you that it is entitled to collect for all or any part of the claims set forth in the several counts of the complaint, then, of course, the plaintiff is entitled to recover a judgment in such amount as may be justified in the evidence and that amount can be in any amount up to or less than the sum total of its aggregate claims."
We find no statement in the charge which informs the jury that the test to be applied in fixing the compensation to which the contractor may be entitled is the reasonable value of the services made necessary by the memorandum of August 3, *516 1950. The effect of the absence of the reasonable value test was to leave the jury unguided as to a material element in the case. There was no objection to the charge on this ground and reference is made to it here for assistance at the retrial.
The fraud issue was no stronger with respect to this count than it was in relation to the various items of the first count. The additional argument is made that after Lincoln had issued the order the inaction of the Authority and Bogert-Childs, and their failure to disclaim responsibility for the bills as they were received over the long period of time covered thereby, lulled the contractor into the continuance of the de-watering procedure and thus constituted fraud. We are unable to recognize this conduct either alone or in combination with the acts charged to Lincoln as fraudulent. If Terminal wished, it could have forced a determination of the issue soon after its first bill had been presented. However, it seemed satisfied to continue charging the de-watering to the August 3 order and to take the risk of nonpayment, if that operation was not an existing obligation under the original contract and if the August 3 order was not binding on the Authority.
Accordingly, we have concluded that the trial court erred in submitting the issue of fraud to the jury for disposition.

FIFTH COUNT

Claim for Extra Work
This count as finally limited by the proof at the trial sought recovery for seven items totaling $2,980.55. According to the complaint and the pretrial order, the engineer ordered certain changes made in the work and in materials which were alleged to constitute extra work.
Extra work is defined in Article 1 of the contract as "work required by the Authority, which in the judgment of the engineer involves changes in or addition to that required by the plans, specifications and addenda in their present form." *517 As already indicated, Article 36 requires any such work to be represented by a written order of the Authority.
No item included in the claim here is supported by an extra work order as required by the contract. If the mutual compact of the parties is to be disregarded and recovery allowed in spite of their solemn undertaking, then the agreement is worthless. Cf. Landstra v. Bunn, 81 N.J.L. 680 (E. & A. 1911); Van Buskirk v. Board of Education, 78 N.J.L. 650, 654 (E. & A. 1910).
Furthermore, no fraud was proved with respect to this count, and even if the suggested fraud was proved, we fail to see in this case how it would have any material bearing on Terminal's known duty to obtain a written extra work order. For these reasons it was error to submit it to the jury for consideration, and the motion to dismiss should have been granted.

The Authority's Set Off
The Authority interposed a set-off of $45,973. This sum had already been deducted from the semi-final payment made to Terminal. It was divided roughly into two parts: $22,273 representing cost of repairing breaks in certain pipes and conduits and remedying defective work, credits for certain gas equipment, charges for 16 additional prints of the contract drawings and for a transformer removal, certain power bills, and charges for temporary heat; and $23,700 for a delay of 237 days beyond the stipulated completion date at the agreed liquidated damage figure of $100 a day.
The jury allowed a total credit of $5,786.39.
Study of this set-off in the light of the charge of the court has led us to the conclusion that it, too, should be the subject of retrial.
One of the contractor's contentions with respect to the portion of the credit claim dealing with repairs and defective work was that under Articles 17 and 18 of the contract it was obligated to "repair, replace or restore * * * any defects or damage in or to the work performed, material supplied or equipment furnished * * * when such defects *518 or damage appear during the period of one year subsequent to the date of acceptance of the work * * *," unless the defects or damage result from abuse of the work or material or equipment after such acceptance; and further that to secure such maintenance the Authority was entitled to retain 2% of the final estimate. It was undisputed that $87,000 had been retained for this purpose, and Terminal maintained that the claimed credit for repairs and defective work should have been charged against the $87,000 and not against the balance due to it at the time of the semi-final payment.
In this connection the court charged the jury in the main charge:
"Terminal further claims that even if they were responsible for the pipe breakage, that it is not a proper matter of credit in this particular case; that it is merely a matter of maintenance and that the Bergen County Sewer Authority should properly charge it against the contract moneys which have already been retained by it for that purpose. Under the terms of the contract, the parties agreed that 2% of the total amount due the contractor should be retained by the Sewer Authority for a period of one year after the completion date, and that retention, the moneys retained, were to cover any breakage or any fault which occurred during the maintenance period of a year after the work was installed and accepted."
There was no further reference to this phase of the case during the main charge. However, the inference which the jury might well have drawn was that if they found the repairs to be within the articles referred to, credit should not be allowed to the Authority because it should look to the maintenance fund.
Later, a number of requests were charged for both parties. One charged on behalf of the Authority was:
"Under the terms of the contract, the obligation to repair pipe breaks was imposed upon the plaintiff and if it did not discharge this obligation, the Engineer was authorized to deduct the cost of the eleven pipe breaks and back filling as set forth in the certificate of substantial completion from moneys otherwise due plaintiff."
The two statements are confusing and in a sense conflicting. If the jury found that the repairs were properly chargeable *519 to the maintenance fund, what would it do with this further instruction?
Beyond the difficulty mentioned, the accomplishment of justice in the case requires consideration of another problem.
If the jury found that the repair credits should be charged against the maintenance fund and therefore disallowed them in this proceeding, how would such result be known? It cannot be determined from the nature of the verdict. Obviously if the jury so decided, the Authority should not be precluded under the doctrine of res judicata from making the charge against the maintenance fund at a later date. But in the absence of a specific finding on the subject it seems likely that the judgment entered on the present verdict would constitute a bar. Such a result would be manifestly unjust.
Consequently, in our judgment the jury should have been instructed that if they found the repair items were chargeable against the maintenance fund, a special finding or verdict to that effect should be returned. It may be said that counsel had the duty of making such a request and consequently no consideration should be given to the question, particularly since no objection was made to the charge. However, since the matter must be retried, we feel that we should notice the matter under R.R. 1:5-3(c).
A reversal as to the set-off verdict cannot be limited to the repair items because the general form of the verdict renders it impossible to decide just what was included in it. What part of the verdict, if any, represents compensation for delay in completion? What part, if any, for repairs? What part for non-repair credit items? The only just solution seems retrial of the whole issue.

The Cross Appeal
The propriety of the dismissal of the third and fourth counts of the complaint is the subject of the cross-appeal.
The third count alleges that the engineer ordered Terminal to perform the wall concrete work contrary to the contract and contrary to its schedule of operations, which necessitated *520 large expenditures, and that the engineer illegally and fraudulently refused to approve payment thereof.
The fourth count makes the same charges with respect to certain slab concrete work.
In the brief the contractor charges that it was "required fraudulently" by defendant's engineer to do the work for which the damage claim is made, and that "specific fraud consisted of his willful interpretation of the contract provisions concerning construction joints to the detriment of the plaintiff."
Section 12.26 of the specifications made the location of construction joints in the wall and slab concrete work subject to the approval of the engineer. No specific distance between joints was set out.
The contractor's pouring schedule as submitted to the engineer for approval provided for joints at intervals ranging from 75 to 100 feet. Bogert-Childs, through Ivan Bogert, Lincoln's superior, wrote saying that "in general, we favor the limiting of the distance between construction joints to about 50 feet." Terminal's president objected to this spacing and Bogert wrote:

"* * * * * * * *
We do not, of course, intend the 50 foot requirement to be fixed, arbitrary limit and may allow somewhat greater distances in special cases, as we have already done at the Digestion Tanks, Primary Tanks, and Pump and Blower House.
However your preparation of the construction joint plans substantially in accordance with the 50 foot limitation will assist in obtaining immediate approval of these drawings and eliminating possible delays in your concreting operations."
Terminal then demanded an extra work order, and upon refusal indicated it would comply with the engineer's directive under protest. The concrete work was then completed, and when the claim for additional payment was refused recovery was sought therefor in this action.
Obviously the determination of a construction problem such as that raised here rests with the engineer both under the section of the specifications referred to and under *521 the general powers prescribed by Article 29. The evidence at the trial fails to reveal in the slightest that the action taken was fraudulent or arbitrary or inconsistent with sound general construction practice. Under the circumstances the decision of the engineer was final and binding on the contractor. Cf. Brashears v. Garland School Dist. No. 4, 133 Ark. 599, 202 S.W. 234 (Sup. Ct. 1918); Dahl v. Edwin Moss & Son, 136 Conn. 147, 69 A.2d 562 (Sup. Ct. Err. 1949).
For the reasons stated, the judgment in favor of respondent is reversed and a new trial is ordered in the manner and on the claims indicated. The judgment involved in the cross-appeal is affirmed.